**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-01068-NYW-KLM

LESLIE ARNOLD,

      Plaintiff,

v.

WELD COUNTY SCHOOL DISTRICT RE-5J,
MICHAEL WAILES, in his individual capacity,
NATE SASSANO, in his individual capacity,
SARA HALL, in her individual capacity, and
JEREMY SCOTT, in his individual capacity,

      Defendants.

---

## ORDER ON MOTION TO DISMISS

---

This matter is before the Court on Defendants' Motion to Dismiss First Amended Complaint and Jury Demand (the "Motion" or "Motion to Dismiss"). [Doc. 34, filed September 6, 2022]. The Court has reviewed the briefing on the Motion and the applicable case law, and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth herein, the Motion is respectfully **DENIED**.

### BACKGROUND

The Court takes the following facts from the First Amended Complaint and Jury Demand ("First Amended Complaint") [Doc. 31, filed August 22, 2022] as true for purposes of this Order. In July 2018, Defendant Weld County School District RE-5J ("District") hired Plaintiff Leslie Arnold ("Plaintiff" or "Ms. Arnold"), an experienced educator and school administrator, to serve as Superintendent of Schools. [*Id.* at ¶¶ 13–14]. The "hiring process" for the position "was competitive and involved the interviewing of a pool of candidates." [*Id.* at ¶ 14]. As

Superintendent, Ms. Arnold "overs[aw] the implementation of policymaking decisions rendered by" the District's Board of Education ("Board").  [*Id.* at ¶ 15].  Although she had a seat at Board meetings, she could not vote on policy.  [*Id.*].  According to her contract, she administered the District pursuant to "Board policy and the requirements, directives, regulations, and guidelines of the Board."  [*Id.*].

In 2020, following "outstanding performance," Ms. Arnold received a salary increase and a new contract.  [*Id.* at ¶ 14].  Ms. Arnold subsequently earned "glowing reviews" for her work during the 2020–2021 school year, including from Defendant Michael Wailes ("Defendant Wailes" or "Mr. Wailes"), the Board's President; Defendant Jeremy Scott ("Defendant Scott" or "Mr. Scott"), the Board's Treasurer; and Defendant Sara Hall ("Defendant Hall" or "Ms. Hall"), the Board's Secretary.  [*Id.* at ¶¶ 16–20].  Again, the District extended Ms. Arnold's employment and increased her salary.  [*Id.* at ¶ 22].  Around this time, the Board's Director was Defendant Nate Sassano ("Defendant Sassano" or "Mr. Sassano") and its Vice President was Peggy Wakeman ("Ms. Wakeman").[1]  [*Id.* at ¶¶ 8, 10].

The District has a nondiscrimination policy ("Policy") that is contained in a handbook ("Handbook") provided to students and employees every school year.  [*Id.* at ¶ 23].  Parents of children enrolled in the District must acknowledge receipt of the Handbook before their children may attend school.  [*Id.*].  The Policy prohibits discrimination "on the basis of disability, race, creed, color, sex, sexual orientation, marital status, national origin, religion, ancestry or need for special education services."  [*Id.* at ¶ 24].  The Policy's objectives include "investigat[ing] and resolv[ing] promptly any complaints of unlawful discrimination and harassment," and

---

[1] The First Amended Complaint names Ms. Wakeman as a defendant.  *See* [Doc. 31 at ¶ 10].  However, on December 19, 2022, the Parties stipulated to Ms. Wakeman's dismissal from this action under Federal Rule of Civil Procedure 41.  *See* [Doc. 56]; [Doc. 77].

"investigat[ing] and appropriately disciplin[ing] staff and students found to be responsible for incidents of harassment or unlawful discrimination in violation of Board policy." [*Id.* at ¶ 25]. Employees must take action to correct Policy violations. [*Id.* at ¶ 26].

In early 2021, Ms. Arnold received several complaints from staff members, parents, and students at Roosevelt High School ("RHS") about Principal Brian Littlefield ("Principal Littlefield"). [*Id.* at ¶ 27]. Situated within a "greater context of significant historical problems at RHS with discriminatory behavior and language," these employees and community members claimed that Principal Littlefield "responded inappropriately to race-related issues, made derogatory comments regarding the LGBTQ community, and treated female employees differently and less favorably than male employees." [*Id.*]. The First Amended Complaint recounts several specific controversies:

-   Principal Littlefield had a teacher remove a "Black Lives Matter" sign from her classroom in response to a January 2021 parental complaint, but permitted another teacher to keep a "Blue Lives Matter" flag. [*Id.* at ¶ 28]. At a meeting to address the matter, at or after which it was decided to remove both signs, Principal Littlefield did not view the disparity as a racial issue, even as he selected Assistant Principal Michael Curtis ("Mr. Curtis"), who is Black,[2] to handle the situation, saying "Michael is black and he can take care of it." [*Id.*

---

[2] When using the term "Black" to refer to groups in racial, ethnic, or cultural terms, this Court capitalizes the term. *See Jones v. Broomfield*, 562 F. Supp. 3d 652, 662 n.3 (C.D. Cal. 2021) (citing Elahe Izadi, *Why hundreds of American newsrooms have started capitalizing the "b" in "Black"*, Wash. Post (June 18, 2020), https://www.washingtonpost.com/lifestyle/media/why-hundreds-of-american-newsrooms-have-started-capitalizing-the-b-in-black/2020/06/18/7687a7a8-b16e-11ea-8f56-63f38c990077_story.html); Mike Laws, *Why we capitalize 'Black' (and not 'white')*, Colum. Journalism Rev. (June 16, 2020), https://www.cjr.org/analysis/capital-b-black-styleguide.php. Nevertheless, where quoting from a Party's papers, this Court reflects the capitalization (or lack thereof) used by the Party.

at ¶ 29]. According to attendees, Principal Littlefield was "insensitive to racial issues and dismissive of the perspective of those who were not white." [*Id.*].

- After the boys' basketball coach used an offensive racial slur in connection with his players' technique at a varsity game in February 2021, Principal Littlefield rebuffed the athletic director's insistence that the coach be terminated and said that they needed to hear from the coach's supporters. [*Id.* at ¶ 30]. Principal Littlefield told Ms. Arnold "this is how sports go" and did not view the matter as a "big deal," although many in the community, including Black teachers and students, were offended by the comment, and the athletic director received a complaint from a Black parent about racial issues at RHS. [*Id.*].

- At a virtual pep rally a week later, a student changed his screen name to evoke a racial slur, offending many students and staff. [*Id.* at ¶ 31]. Mr. Wailes called the incident "really bad" in a text message to Ms. Arnold. [*Id.*]. In contrast, Principal Littlefield "downplayed the situation and merely said 'kids will be kids,'" failing to act and dismissing the notion that he should consult with Black staff members. [*Id.* at ¶ 32]. "Staff at RHS subsequently grew frustrated by Principal Littlefield's insensitivity and lack of response." [*Id.*].

- Principal Littlefield dismissed a female administrator's ideas without consideration but entertained the same ideas when suggested by a man. [*Id.* at ¶ 33]. Principal Littlefield "routinely interrupted and ignored" this administrator and a female middle school principal, and "snapped" at them repeatedly. [*Id.* at ¶ 34]. He also favored his male subordinates and would exclude the female administrator and principal from plans and committees. [*Id.*]. A group of female teachers formed a group to discuss their dismissive treatment by Principal Littlefield. [*Id.*].

- At a training related to LGBTQ issues, Principal Littlefield "stated that he could not speak his mind because he was in a group with 'that guy', a reference to a teacher Littlefield mistook to be gay based on the teacher's mannerisms."  [*Id.* at ¶ 35].  Principal Littlefield told District employees that he needed to shower after being around gay people.  [*Id.*].

- Discussing the Homecoming court, Principal Littlefield told the cheer coach: "If you take over you've got to promise me that we will have a *true king and true queen* for homecoming.  We're not Boulder."  [*Id.* at ¶ 36 (emphasis in original)].  The cheer coach understood these comments to refer to excluding transgender students.  [*Id.* at ¶ 37].

- Principal Littlefield mocked Colorado Governor Jared Polis's sexual orientation, saying that he "hate[d]" and "couldn't stand" having a first gentleman instead of a first lady.  [*Id.* at ¶ 38 (alteration in original)].  He connected masking requirements during COVID-19, which he disdained, with "having gay decisionmakers in Colorado."  [*Id.*].

- Principal Littlefield mocked Mr. Scott "with a high-pitched voice and a hand gesture," to suggest that he was gay and/or effeminate.  [*Id.* at ¶ 39].

- At an RHS volleyball game in late February 2021, RHS students "singled out and harassed the lone Black student on the opposing school's team and barked at the student."  [*Id.* at ¶ 40].  After Principal Littlefield had the athletic director investigate the incident and declined to engage with the students involved, teachers complained that Principal Littlefield "was not properly addressing racial bias and hostility" at RHS.  [*Id.* at ¶ 41].  Ms. Arnold had Principal Littlefield attend a diversity training.  [*Id.* at ¶ 42].

On March 1, 2021, Ms. Arnold and Cara Anderson ("Ms. Anderson"), the Director of Human Resources, met with Principal Littlefield to discuss these incidents.  [*Id.* at ¶¶ 36, 43]. Around this time, Ms. Arnold received reports that one Black employee "believed that he had been

subjected to racial discrimination by Principal Littlefield," and that another "was deeply frustrated and offended by the racial incidents" at RHS.  [*Id.* at ¶ 44].  Ms. Arnold asked Ms. Anderson to open an investigation into Principal Littlefield pursuant to the Policy.  [*Id.*].

On March 4, 2021, Ms. Arnold and Ms. Anderson brought their concerns about Principal Littlefield's conduct to Board members Mr. Wailes and Ms. Wakeman.  [*Id.* at ¶ 45].  At that meeting, Ms. Arnold and Ms. Anderson learned that Principal Littlefield had filed grievances against them, alleging that they "were discriminating against him because he is a white, conservative, Christian male." [*Id.*].  The District retained a third party to investigate all of these complaints.  [*Id.* at ¶ 46].  In an April 18, 2021, report, the investigator concluded that the allegations against Ms. Arnold and Ms. Anderson were meritless, but that "almost every allegation brought against Principal Littlefield was substantiated."  [*Id.* at ¶¶ 47–48].  Mr. Wailes later confirmed via email that Principal Littlefield's allegations about Ms. Arnold creating a hostile work environment were baseless.  [*Id.* at ¶ 59].

Ms. Arnold met with Mr. Wailes again on April 21, 2021, to discuss the investigator's finding.  [*Id.* at ¶ 49].  She recommended that the District terminate Principal Littlefield "because of his substantiated illegal and discriminatory conduct."  [*Id.*].  Mr. Wailes relayed this recommendation to the other members of the Board but disagreed with it, suggesting instead that Principal Littlefield be removed from his current position and "assigned projects in the administration building until the end of the school year."  [*Id.* at ¶¶ 50–51].  Ms. Arnold acknowledged this was a "viable option."  [*Id.* at ¶ 51].  The next day, Ms. Arnold learned that the Board decided to permit Principal Littlefield to remain in his role, albeit no longer under her direct supervision.  [*Id.* at ¶ 52].  Board members subsequently received "considerable backlash and public pressure," supporting Principal Littlefield, from community members who learned of Ms.

Arnold's position.  [*Id.* at ¶ 54].  On April 23, 2021, Ms. Arnold convened a mandatory diversity training.  [*Id.* at ¶¶ 55–56].  Principal Littlefield did not attend.  [*Id.* at ¶ 55].  The District paid for the program with federal funds.  [*Id.* at ¶ 56].[3]

At a meeting with Mr. Wailes and Mr. Scott on April 26, 2021, Mr. Scott informed Ms. Arnold that the Board intended to revisit her February 2021 evaluation.  [*Id.* at ¶ 57].  The Board members assured Ms. Arnold that this was not a step toward her termination and that she could participate in the meetings to discuss her evaluation.  [*Id.* at ¶¶ 57–58].  However, Ms. Arnold was not invited to these meetings.  [*Id.* at ¶ 58].  Ms. Arnold did attend a public Board meeting on May 5, 2021, at which "various parents berated Ms. Arnold with insults and baseless criticisms regarding the investigation into the discriminatory misconduct of Principal Littlefield," and the Board did not intervene or give Ms. Arnold a chance to respond to these accusations.  [*Id.* at ¶ 61].

On May 7, 2021, Ms. Arnold emailed the Board, voicing her "strenuous[] disagree[ment]" with its decision to retain Principal Littlefield.[4]  She wrote:

---

[3] During the 2020–2021 school year, the District received $4,130,312 in federal funding from various sources including the Every Student Succeeds Act ("ESSA"), Elementary and Secondary School Emergency Relief ("ESSER"), the Individuals with Disabilities Education Act ("IDEA"), Perkins grants, the School Climate Grant, and Coronavirus Relief Funds.  [Doc. 31 at ¶ 96].  Students were the "intended beneficiaries" of much of this funding, but "teachers in the District and RHS were the intended beneficiaries" of the COVID-related funding, which helped alleviate challenges related to hiring and retaining teachers.  [*Id.* at ¶¶ 97–98].  Of the $1,917,668 the District received in COVID-related funding during the 2020–2021 school year, the District spent $1,461,643.08 on increasing teacher salaries.  [*Id.* at ¶ 98].  ESSER funds were used "to provide employment by increasing teacher salaries, increasing salary and benefits for nurses working in the District, and creating new employment positions in the District."  [*Id.* at ¶ 99].  ESSA funds were used for the diversity training Ms. Arnold organized.  [*Id.* at ¶¶ 56, 100].

[4] A court may take judicial notice of its own files and records, as well as facts which are a matter of public record.  *See* Fed. R. Evid. 201; *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).  This Court takes judicial notice of a lawsuit that Principal Littlefield has filed, alleging that the District terminated him at the end of the 2020–2021 school year, in response to which the District does not dispute that his employment ended at that time.  *See Littlefield v. Weld Cnty. Sch. Dist. RE-5J*, Case No. 22-cv-02241-PAB-KLM (D. Colo.).

> The action the Board of Education took to leave Brian Littlefield at RHS until the end of the school year seems like it was done to potentially cover-up and to hide the fact that Brian Littlefield had 7 substantiated allegations against him that dealt with his involvement in racism, homophobia, misogyny, not managing student bullying behaviors, not taking care for the safety and security of our staff and students, failure to do his job, and using derogatory slang to call our students essentially "stupid farmers".  I shared with Michael Wailes I did not want this community "blowing up" prior to your work session when you heard these substantiated allegations and I could agree to almost any scenario except leaving Brian at RHS.  Even though the path was taken by the board to leave him at RHS, I'm still committed to calming the situation down.

[*Id.* at ¶ 63].  Several Board members were close with Principal Littlefield, and all Board members were "angry and upset over Ms. Arnold's complaint."  [*Id.* at ¶ 64].  Rather than respond to Ms. Arnold's email, the Board unanimously voted to terminate Ms. Arnold, with Mr. Wailes informing her at a May 12, 2021, meeting that the District was "going in a different direction."  [*Id.* at ¶ 65].  Ms. Arnold questioned the rationale, recalling her positive performance reviews, and Mr. Wailes then stated that the Board was unilaterally terminating her without cause pursuant to her employment contract.  [*Id.* at ¶¶ 66–67].  After Ms. Arnold again questioned the Board's motivation, Mr. Wailes alluded to the District's concerns about how Ms. Arnold handled the COVID-19 pandemic and treated her staff.  [*Id.* at ¶¶ 68–69].  The Board had not made Ms. Arnold aware of any of these concerns before the May 12, 2021, meeting, and most predated her most recent contract extension.  [*Id.* at ¶ 70].  Moreover, "[n]one of the issues raised were true or accurate."  [*Id.*].  The Board had "final decision-making authority over the hiring and firing of District Superintendents," so Ms. Arnold could not challenge its decision.  [*Id.* at ¶ 71].

In the aftermath of Ms. Arnold's termination, Board members made "false and stigmatizing comments" about her job performance.  [*Id.* at ¶ 72].  On May 13, 2021, Mr. Wailes marked Ms. Arnold "unsatisfactory" on her state education license renewal "without any legitimate basis"; doing so prevented her from applying for school administrative positions for several months.  [*Id.* at ¶ 73].  Then, at a public meeting on August 4, 2021, Mr. Wailes "insinuated that Ms. Arnold

ha[d] mismanaged [her] email account," and indicated that her leadership was problematic.  [*Id.* at ¶ 72].  Ms. Arnold alleges that all of this was done in retaliation for her complaints about Principal Littlefield, and that, in part because of it, she has not been able to obtain comparable reemployment, at least as of August 2022.  [*Id.* at ¶¶ 72–74].

On May 2, 2022, Ms. Arnold filed this action.  *See generally* [Doc. 1].  After Defendants filed a motion to dismiss [Doc. 25], Ms. Arnold amended her complaint.  *See generally* [Doc. 31].  The First Amended Complaint contains four causes of action.  Against all Defendants, Ms. Arnold brings a claim via 42 U.S.C. § 1983 for retaliation in violation of 42 U.S.C. § 1981 ("Count I").  [*Id.* at ¶¶ 76–88].  Against the District, Ms. Arnold alleges retaliation in violation of Title VII, Title VI, and the Colorado Anti-Discrimination Act ("CADA") ("Count II," "Count III," and "Count IV," respectively).  [*Id.* at ¶¶ 89–110].  Ms. Arnold seeks reinstatement, lost wages, compensatory damages for emotional distress and reputational harm, and punitive damages, among other forms of relief.  [*Id.* at 27–28].

On September 6, 2022, Defendants filed the instant Motion to Dismiss.  [Doc. 34].  Therein, they argue that Plaintiff's claims should be dismissed for failure to state a claim under Rule 12(b)(6).  [*Id.*].  Ms. Arnold responded in opposition on October 11, 2022 ("Response").  [Doc. 43].  Defendants filed their Reply on November 7, 2022.  [Doc. 54].  The Motion to Dismiss is ripe for resolution.

## LEGAL STANDARDS

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir.

2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nevertheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claims "across the line from conceivable to plausible").  The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Defendants argue that the First Amended Complaint fails to state any claim for relief.  Because each cause of action implicates opposition to unlawful employment practices, this Court begins its analysis with Count II, brought pursuant to Title VII, to provide a framework for the remainder of the claims.  For the reasons that follow, the Court concludes that all claims may proceed.

## I.    Title VII Retaliation (Count II)

Title VII of the Civil Rights Act of 1964 not only prohibits employment discrimination against an individual because of the individual's "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), but also makes it unlawful to "oppose[] any practice made an unlawful employment practice."  *Id.* § 2000e-3(a).  Such opposition is known as "protected activity."  *See Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019).  A prima facie retaliation case entails showing (1) "protected opposition to discrimination"; (2) retaliation that would be viewed as

"materially adverse" by a "reasonable employee"; and (3) a "causal connection" between them. *Id.* In her First Amended Complaint, Ms. Arnold alleges that she "engaged in protected activity by expressing her good faith belief that an agent of the District intentionally discriminated against black, female, and transgender employees and that the District failed to remedy the discrimination." [Doc. 31 at ¶ 92]. Ms. Arnold must demonstrate "'a reasonable good-faith belief that' she was opposing discrimination." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1016 (10th Cir. 2004)). In their Motion to Dismiss, Defendants argue that Ms. Arnold did not engage in protected activity for purposes of Title VII. [Doc. 34 at 16–18]. Alternatively, Defendants suggest that Ms. Arnold was exempt from Title VII as the District's Superintendent, either because she was personal staff to, or a policymaking appointee of, the elected Board. [*Id.* at 13–16].

### A.   Protected Activity

The Motion makes two arguments respecting protected activity: (1) that a "manager rule" applies to Ms. Arnold, and because she reported discrimination pursuant to her job duties she did not engage in protected activity; or (2) that Ms. Arnold's disagreement with the Board's decision to retain Principal Littlefield "is not a complaint about discrimination and harassment" at all. [*Id.* at 17–18].

Defendants urge the Court to apply a "manager rule" to the protected-activity analysis based on the Tenth Circuit's decision in *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996). *See* [Doc. 34 at 16–17]. In *McKenzie*, an FLSA case, the court found no protected activity where the plaintiff, a personnel director, "never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company." *McKenzie*, 94 F.3d at 1486 (emphasis omitted). To participate in protected activity, *McKenzie*

instructs that "the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." *Id.* at 1486–87. Defendants also cite *Loudon v. K.C. Rehabilitation Hospital, Inc.*, where a court outside this District applied the "manager rule" to a Title VII claim involving a human resources director:

> Under the "manager rule," employees required as part of their job duties to report or investigate complaints of discrimination cannot claim that such reporting or investigating itself is a protected activity under the opposition clause because conveying another's discrimination complaint is not the same as opposing unlawful practices. Put simply, an employee cannot use the performance of her job duties as a basis for protected activity.

339 F. Supp. 3d 1231, 1238 (D. Kan. 2018) (citation omitted). Defendants cite no other authority to support a "manager rule" and do not address the matter in their Reply. *See* [Doc. 54 at 3–5, 9].

In her Response, Ms. Arnold argues that *McKenzie*—to the extent that it is not limited to retaliation under the Fair Labor Standards Act—has been overruled by subsequent Supreme Court cases that more broadly interpret the scope of protected activity under Title VII. [Doc. 43 at 18]; *see also Weeks v. Kansas*, 503 F. App'x 640, 643 (10th Cir. 2012). Specifically, in *Crawford v. Metropolitan Government of Nashville and Davidson County*, the Supreme Court explained that Title VII opposition carries its "ordinary meaning: to resist or antagonize; to contend against; to confront; resist; withstand." 555 U.S. 271, 276 (2009) (cleaned up). Ms. Arnold also points to out-of-circuit authority rejecting a "manager rule." *See, e.g.*, *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1346 (11th Cir. 2022) (a "manager rule" would have "no basis in the text of Title VII's opposition clause and actually contradicts the text of it"); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 423 (4th Cir. 2015).

This Court need not now consider the relationship between *McKenzie* and *Crawford*, nor even the application of a "manager rule." Even assuming without deciding (1) that *McKenzie* applies with full force to Title VII; (2) that a "manager rule" exists in the Tenth Circuit post-*Crawford*; and (3) that such a heightened standard covers Ms. Arnold notwithstanding the factual differences between the nature of her position and those in the cases cited by Defendants, the Court nonetheless finds that Ms. Arnold sufficiently alleged that she engaged in protected activity by opposing Principal Littlefield's continued employment on behalf of other employees subject to discrimination, above and beyond conveying those employees' concerns.

Defendants argue that, as the District's Superintendent, Ms. Arnold was Principal Littlefield's supervisor, and merely performed her job duties by investigating the various complaints against him. [Doc. 34 at 17]. They suggest that nothing in the First Amended Complaint "would support a finding that she 'stepped outside' her role of representing the school district." [*Id.*]. But the Court respectfully agrees with Ms. Arnold that, construed in her favor, the First Amended Complaint demonstrates she acted beyond "her ordinary job responsibilities." [Doc. 43 at 19]. The First Amended Complaint describes the nature of her employment as facilitating the Board's decisions, which is the opposite of actively resisting the Board's retention of Principal Littlefield on behalf of employees that she believed were subject to discrimination.[5] *See* [*id.* ("[S]trenuous disagreement with the personnel decisions of the Board was not within Ms. Arnold's job duties, nor was it within Ms. Arnold's job duties to assert that the Board itself (her

---

[5] Defendants attach Ms. Arnold's employment contract to their Motion, *see generally* [Doc. 34-1], for the proposition that Ms. Arnold's contract instructed that "she was responsible for 'administ[ration of] the District according to the Board policy and the requirements, directives, regulations, and guidelines of the Board.'" [Doc. 34 at 2]. This same factual allegation is quoted in the First Amended Complaint. [Doc. 31 at ¶ 15]. Thus, this Court need not look outside the four corners of the First Amended Complaint, as Defendants do not explain how else Ms. Arnold's employment contract supports their position.

supervisor) was covering up discrimination.")].   The Court also notes that the First Amended Complaint alleges that Ms. Arnold was no longer Principal Littlefield's direct supervisor at the time she emailed the Board.  [Doc. 31 at ¶ 52].  Unlike in *McKenzie* or *Loudon*, even assuming the application of a "manager rule," this factual allegation would allow a factfinder to conclude that Ms. Arnold stepped outside her job description  when she "strenuously disagreed" with the Board's decision to retain Principal Littlefield and accused the Board of a "cover-up . . . to hide the fact that Brian Littlefield had 7 substantiated allegations against him that dealt with his involvement in racism, homophobia, [and] misogyny."  [*Id.* at ¶ 63].

Defendants argue, without citation to authority, that Ms. Arnold's email "was not a complaint about discrimination at all," but merely a response to the Board's disagreement with her recommendation to terminate Principal Littlefield.  [Doc. 34 at 18].  Ms. Arnold responds that she "repeatedly complained that Littlefield had engaged in discrimination and that the Board had failed to appropriately address that discrimination" and "brought underlying concerns about Mr. Littlefield's discriminatory conduct to an investigator and the Board directly."  [Doc. 43 at 19 n.13 (citing Doc. 31 at ¶¶ 44–46, 63)].  Ms. Arnold's May 7 email is quoted in Paragraph 63 of the First Amended Complaint, in which she states:

> The action the Board of Education took to leave Brian Littlefield at RHS until the end of the school year seems like it was done to potentially cover-up and to hide the fact that Brian Littlefield had 7 substantiated allegations against him that dealt with his involvement in racism, homophobia, [and] misogyny.

[Doc. 31 at ¶ 63].  There are no "magic words" necessary to qualify for protected opposition; instead, the employee simply must convey to the employer his or her concern that the employer has engaged in an unlawful practice prohibited by discrimination law.  *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  This Court finds that, at the pleading stage, the allegations in Paragraph 63 are sufficient to allow a factfinder to conclude that the email was a

complaint about discrimination.  Taking additional allegations in the First Amended Complaint as true and viewing them in the light most favorable to the non-movant,[6] Ms. Arnold advised the Board about workplace discrimination on behalf of Black, female, and LGBTQ employees, and opposed Principal Littlefield's retention to the extent it would perpetuate such discrimination. [Doc. 31 at ¶¶ 45, 49, 62–63].  These allegations plausibly constitute protected activity.  *See McKenzie*, 94 F.3d at 1486–87 (employee engages in protected activity under "manager rule" if she "engage[s] in activities that reasonably could be perceived as directed towards the assertion of rights protected by the" statute).

### B.    Exemptions to "Employee" Status

The other dispute relevant to Ms. Arnold's Title VII theory is whether she is protected by the statute in the first place.  Title VII only covers "employees."  *See* 42 U.S.C. § 2000e-3(a).  An "employee" is defined as "an individual employed by an employer," subject to several exemptions, two of which are relevant here.  *Id.* § 2000e(f).  Specifically, Title VII does not cover "any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or *any person chosen by such officer to be on such officer's personal staff*, or an *appointee on the policy making level* or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office."  *Id.* (emphasis added).  Defendants contend that Ms. Arnold is subject to both the "personal staff" and "appointee on the policy making level" exemptions.

---

[6] Because we construe the allegations in Ms. Arnold's favor, *Casanova*, 595 F.3d at 1124, we must reject Defendants' suggestion that the discriminatory incidents recounted in the First Amended Complaint may have reached Ms. Arnold but did not necessarily make it to the Board.  *See* [Doc. 54 at 4–5].  Viewed as a whole, the First Amended Complaint alleges (1) that various discriminatory incidents occurred; (2) that Ms. Arnold informed the Board "about Littlefield's discriminatory conduct"; (3) that a third-party investigator "look[ed] into the complaints of illegal discrimination against Principal Littlefield"; and (4) that Ms. Arnold emailed the Board, referencing "7 substantiated allegations" against Principal Littlefield.  [Doc. 31 at ¶¶ 27–41, 45–46, 63].

Mindful that it must limit its inquiry to the well-pleaded facts of the First Amended Complaint at this stage, this Court respectfully disagrees.

### 1.    "Personal Staff"

Defendants argue that, as Superintendent, Ms. Arnold qualified as "personal staff" to the Board, and was thus exempt from Title VII, based on the factors courts typically consider:

> (1) [W]hether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Nichols v. Hurley*, 921 F.2d 1101, 1110 (10th Cir. 1990) (quoting *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 151 (5th Cir. 1985)).  Specifically, Defendants contend that "the Board has the power to appoint or remove the Superintendent, the Board conducted her evaluations, and she directly reported to the Board."  [Doc. 34 at 14].  Ms. Arnold responds on the merits of those factors, but also argues that "the plain text of Title VII limits the personal staff exception to 'persons who serve at the direction of a single public official' and excludes Plaintiffs who reported to 'a board or the collective members of a council.'"  [Doc. 43 at 15–16 (quoting *Douglas v. Bd. of Trs. of Cloud Cmty. Coll.*, No. 21-cv-02400-KHV, 2022 WL 1538678, at *27–28 (D. Kan. May 16, 2022))].  In the Reply, Defendants suggest that any cases applying that approach are nonbinding, and state that "neither the District Court of Colorado nor the Tenth Circuit have ever ruled on this proposition." [Doc. 54 at 10].

Having reviewed the text of the statute, which speaks in the singular and describes the non-employee as "*personal* staff," as well as the cases cited by Ms. Arnold, the Court respectfully agrees that the exception is properly limited to individuals working under one elected official and thus does not cover Ms. Arnold's employment by the Board.  Tenth Circuit precedent applying the

exception tracks this approach. *See Owens v. Rush*, 654 F.2d 1370, 1376–77 (10th Cir. 1981) (undersheriff and sheriff); *Kelley v. City of Albuquerque*, 542 F.3d 802, 808 n.7 (10th Cir. 2008) (assistant city attorney and mayor). Indeed, the factors the exemption considers seem to presume this approach. *See Nichols*, 921 F.2d at 1110 (courts look at "whether the person in the position at issue is personally accountable to *only that elected official*" (emphasis added)); *see also Douglas*, 2022 WL 1538678, at *9 (noting that "the *Nichols* factors . . . emphasize the singular nature of the elected official"). Moreover, the "personal staff" exemption should be narrowly construed. *See Starrett v. Wadley*, 876 F.2d 808, 821 (10th Cir. 1989); *see also Owens*, 654 F.2d at 1375 ("Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official."); *Rabouin v. Colo. Dep't of L.*, 754 F. Supp. 171, 174 (D. Colo. 1990) ("The personal staff exception . . . is intended to exempt those who are chosen by an elected official and who are in a close, personal, and immediate relationship with the elected official.").

The Tenth Circuit instructs courts to interpret the words "personal staff" "in accordance with their ordinary, everyday meaning." *Owens*, 654 F.2d at 1375. Upon due consideration, this Court does not find it consistent with that ordinary meaning to say that, when the Board interviewed a pool of candidates in a competitive hiring process and retained Ms. Arnold as its Superintendent of Schools, [Doc. 31 at ¶ 14], Board members "chose[]" Ms. Arnold "to be on [their] personal staff." 42 U.S.C. § 2000e(f). Simply put, a multimember body does not have "personal staff" in the way that an individual elected official does. *See Horne v. Russell Cnty. Comm'n*, 379 F. Supp. 2d 1305, 1318 (M.D. Ala. 2005) ("The plain language of the statute does not encompass persons who serve at the direction of a board or body of public officials."), *aff'd*,

180 F. App'x 903 (11th Cir. 2006).[7]  Because Ms. Arnold reported to a five-member Board, her employment cannot fall within Title VII's exemption for "personal staff."

### 2.    "Appointee on the Policy Making Level"

Defendants argue in the alternative that analyzing several factors listed by a federal court in Pennsylvania reveals that Ms. Arnold was exempt from Title VII "[a]s a high-level appointee of elected officials."  [Doc. 34 at 14–15]; *see also* 42 U.S.C. 2000e(f).  Ms. Arnold responds that the exemption should be interpreted narrowly under governing precedent and "applies only to those who were 1) appointed by an elected official, and 2) acted as a policymaker."  [Doc. 43 at 17 (quoting *Crumpacker v. Kan., Dep't of Hum. Res.*, 474 F.3d 747, 752 (10th Cir. 2007))].  The disagreement involves the import of several allegations in the First Amended Complaint, some of which were inserted after Defendants filed a prior motion to dismiss [Doc. 25] which the First Amended Complaint rendered moot.  *See* [Doc. 32].  Specifically, the First Amended Complaint alleges that the Superintendent hiring process was competitive, and neither the Board nor Ms. Arnold understood it as "an appointment process," and that Ms. Arnold "was not a District policymaker" and merely implemented Board decisions on which she lacked a vote.  [Doc. 31 at ¶¶ 14–15].  Ms. Arnold suggests these allegations preclude the exception's application, whereas Defendants contend that they are conclusory or inapposite.  [Doc. 34 at 15–16; Doc. 43 at 17; Doc. 54 at 11].

---

[7] *But see Casey v. W. Las Vegas Indep. Sch. Dist.*, No. 04-cv-01157-ACT-DJS, 2006 WL 8444558, at *6 (D.N.M. Jan. 27, 2006) (holding that "personal staff" exemption applied to a school superintendent).  This Court respectfully disagrees with the reasoning of the *Casey* court and notes that it is not binding authority.  *See, e.g.*, *United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("[D]istrict courts in this circuit are bound by our decisions and those of the United States Supreme Court—they are not bound by decisions of other district courts.").

The Court agrees with Ms. Arnold that, in the Tenth Circuit, the exemption at issue requires the non-employee to "(1) have been appointed by an elected official, and (2) acted as a policy maker." *Crumpacker*, 474 F.3d at 752.  Determining whether a person has been appointed is a "two-step process" that involves "decid[ing] the meaning of applicable [state] law" and, if it is "indeterminate," reviewing "the underlying facts." *Id.* at 753.  Neither Party has suggested that any provision of Colorado law is relevant to understanding Ms. Arnold's employment. *Cf. id.* at 752 (Kansas statute conditioned plaintiff's employment on "the consent of the governor"). According to the First Amended Complaint, Ms. Arnold was hired as part of a competitive process that involved interviewing a pool of candidates and was not understood as an appointment process. *See* [Doc. 31 at ¶ 14].  Ms. Arnold alleges that she was hired by the District, and not by the Board. *See* [*id.*].   At the motion-to-dismiss stage, these allegations supply the "underlying facts" for purposes of *Crumpacker* analysis.

Even if the appointee analysis came out differently, Defendants do not and cannot explain how Ms. Arnold qualified as a policymaker as a matter of law. *See Crumpacker*, 474 F.3d at 752. Indeed, Defendants acknowledge the First Amended Complaint's allegation that Ms. Arnold "administer[ed] the District according to Board policies."  [Doc. 34 at 15]; *see also* [Doc. 31 at ¶ 15].  Although Defendants disagree that her lack of voting power is relevant to the policymaker analysis—because "voting power is not required for an appointee to fall under this exception"—they fail to point out why Ms. Arnold *is* a policymaker.  [Doc. 34 at 16].  Viewing the First Amended Complaint's allegations in Ms. Arnold's favor, the Court concludes that she did not make policy.  *See Anderson v. City of Albuquerque*, 690 F.2d 796, 800–801 (10th Cir. 1982) (noting that the "typical duties" in plaintiff's job description did not "involve[] formulating policy"); *see also id.* at 800 ("Congress intended the exemption to be narrowly construed.").  To

be sure, Defendants assert in their Reply that, "per school district policies, [Ms. Arnold] does have some policy making authority, which was delegated to her by the Board." [Doc. 54 at 11]. However, Defendants offer no citation for this position, which directly contradicts Ms. Arnold's allegation (which the Court must take as true) that she "was not a District policymaker." [Doc. 31 at ¶ 15]. Defendants' factual argument is therefore premature. The Court concludes that, at least at this stage of the case, Defendants cannot demonstrate that the exemption for appointed policymakers covers Ms. Arnold. Her Title VII claim may therefore proceed.

## II.   CADA Retaliation (Count IV)

The Parties agree that claims for retaliation under CADA are subject to the same protected-activity analysis as like claims under Title VII. *See* [Doc. 34 at 13 n.4; Doc. 43 at 14 n.7]. Defendants do not ask the Court to view the matter any differently when it comes to the CADA claim, so the Court's decision with respect to protected activity under Title VII generally controls the CADA issue for purposes of the Motion. For the reasons discussed above, the CADA claim against the District may also proceed.

## III.   Section 1981 Retaliation (Count I)

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981.[8] The statute "encompasses a complaint of retaliation against a person who complained about a violation of another person's contract-related 'right.'" *Muller v. Islands at Rio Rancho Homeowners Ass'n*, 564 F. App'x 411, 414 (10th Cir. 2014) (quoting *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008)). Any claim thus requires

---

[8] Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

"identify[ing] an impaired contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (internal quotation marks omitted). As with Ms. Arnold's other theories, a prima facie case for retaliation entails protected opposition to discrimination, an adverse action, and a connection between them. *See Muller*, 564 F. App'x at 414.

In their Motion, Defendants argue that Ms. Arnold's § 1981 retaliation theory fails on the merits because the First Amended Complaint fails to allege either the existence or the impairment of a contract. [Doc. 34 at 10–11]. Separately, Defendants contend that Defendants Wailes, Sassano, Hall, and Scott ("Individual Defendants") are shielded from this § 1983 claim by qualified immunity because Ms. Arnold has failed to make differentiated factual allegations with respect to each of the Individual Defendants. [*Id.* at 11–12]. In their Reply, Defendants also argue, for the first time,[9] that Ms. Arnold did not engage in protected activity for purposes of the § 1981 claim. [Doc. 54 at 3–5].

### A.    Existence and Impairment of Contractual Rights

Defendants argue that the Policy, as contained in the Handbook, is not a contract because "[u]nilaterally publishing a policy and asking a family to sign that they have received the policy does not give rise to a contractual relationship" under Colorado law, which requires an offer,

---

[9] Defendants note in the Reply that they previously "moved to dismiss [the § 1981] claim because Plaintiff had not identified impaired contractual relationships, and even if she had, she failed to allege that she engaged in protected activity." [Doc. 54 at 2]. Plaintiffs agree with this summary. *See* [Doc. 43 at 2 ("[I]n seeking dismissal of Ms. Arnold's claim for violation of 42 U.S.C. § 1981, Defendants ignore that Ms. Arnold complained of employment discrimination and instead solely argue that Ms. Arnold's complaints about discrimination against students are not protected activity.")]. But, from the Court's review, the Motion only makes a protected-activity argument with respect to the *other* three claims in the First Amended Complaint. *See generally* [Doc. 34 at 13, 19]. The extent to which the protected-activity argument may not properly be before the Court is immaterial, however, as Defendants fail to redefine it for purposes of § 1981 and the argument would necessarily fail under the analysis above. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 n.1 (10th Cir. 1998) (same elements for Title VII and § 1981 retaliation claims).

acceptance, and consideration.   [Doc. 34 at 10].   Ms. Arnold responds that the contractual relationships at play include (1) District employees' rights under their employment contracts; (2) District employees' rights under the Policy; and (3) students' rights under the Policy.  [Doc. 43 at 7–10].

First, state law suggests that the Policy could not be enforced by the District's students, so they lack a contractual right for § 1981 purposes.  *See Denver Parents Ass'n v. Denver Bd. of Educ.*, 10 P.3d 662, 665 (Colo. App. 2000) ("Plaintiffs cannot hold a public school district to the implementation of its educational objectives in a judicial setting.").   Second, even if parts of the Handbook may create contractual rights on behalf of employees, the parts of the Policy at issue would not.   Ms. Arnold argues that "the type of promises made in the District's Handbook have been repeatedly found to be enforceable."  [Doc. 43 at 9].   But the case she cites for that argument distinguishes between "a general statement of values which under Colorado law is not enforceable" and more concrete commitments.  *Belgasem v. Water Pik Techs., Inc.*, 457 F. Supp. 2d 1205, 1220 (D. Colo. 2006).

As relevant to the Principal Littlefield matter, the Policy commits the District to "investigat[ing] and appropriately disciplin[ing]" violators.  *See* [Doc. 31 at ¶ 25].   According to the First Amended Complaint, an investigation occurred.  [*Id.* at ¶¶ 46–47].   And, according to the First Amended Complaint, the Board opted against immediately terminating Principal Littlefield. [*Id.* at ¶ 63].   Ms. Arnold alleges that, "[i]n violation of promises made by the District Handbook, the Board did not appropriately discipline Mr. Littlefield."  [*Id.* at ¶ 53].   But a commitment to "appropriate discipline" is, as Defendants posit, discretionary, and cannot give rise to a contractually enforceable right based on a difference of opinion or perspective.  *See* [Doc. 34 at 11].   A handbook's "[g]eneral commitments to equal opportunity and fairness in the workplace

are too vague to be legally enforceable." *Belgasem*, 457 F. Supp. 2d at 1220.  For that reason, the Policy is not relevant to Ms. Arnold's § 1981 claim.  That leaves the general terms of District employees' employment.

Ms. Arnold argues that "race discrimination against at-will employees has been held to constitute the interference with the making and enforcement of an employment contract" for § 1981.  [Doc. 43 at 8 (emphasis omitted)].  The First Amended Complaint alleges that the District's "[e]mployees were also employed under one-year contracts."  [Doc. 31 at ¶ 79]. Accordingly, Ms. Arnold reasons that "complaining about race discrimination against employees and a failure to remedy such discrimination" at RHS constituted protected activity.  [Doc. 43 at 8]. In their Reply, Defendants' only answer to this argument is that, even if certain District employees "may have had cognizable contracts with the District for purposes of § 1981, Plaintiff nonetheless fails to identify which employees she believes were discriminated against or to appropriately define how the District interfered with their contract."  [Doc. 54 at 3].  But Plaintiff laid out her theory—that the District permitted racial discrimination against contracted employees—in her Response, and Defendants do not appear to dispute in the Reply that the theory implicates § 1981. The Court will not make additional arguments on Defendants' behalf.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).

To the extent Defendants' argument is that the § 1981 claim is insufficiently specific as pleaded, the Court respectfully disagrees: the First Amended Complaint identifies multiple Black employees and alleges a host of racial incidents that, in short succession, allegedly contributed to

discriminatory conditions at RHS.  Of course, Plaintiff still needs to prove her allegations and satisfy the requirements for municipal liability[10] to recover.  Factual disputes may arise, and legal questions other than those presented here may emerge as relevant, but the § 1981 claim may proceed against the District, notwithstanding Defendants' particular arguments for dismissal.

### B.    Qualified Immunity

Defendants argue that "Plaintiff's § 1981 claims, made through § 1983, against the individual Defendants are barred by the qualified-immunity doctrine," because the First Amended Complaint does not identify "specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated a plaintiff's clearly established constitutional rights."  [Doc. 34 at 11–12].  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "When a defendant asserts a qualified immunity defense, the plaintiff must meet a strict two-part test.  The plaintiff must establish (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct."  *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation and quotation omitted).  Plaintiffs bear the burden to overcome the assertion of qualified immunity.[11]

---

[10] There is no *respondeat superior* liability under 42 U.S.C. § 1981. *See Randle v. City of Aurora*, 69 F.3d 441, 446 n.6 (10th Cir. 1995) (citing *Jett*, 491 U.S. at 735–36).  In order for municipal liability to arise under § 1981, Ms. Arnold must prove that the District's officials acted pursuant to a "custom or policy" of "discriminatory employment practices."  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Randle*, 69 F.3d at 446 n.6).

[11] In discussing qualified immunity, the Parties refer exclusively to Ms. Arnold's "constitutional rights."  *See* [Doc. 34 at 12; Doc. 43 at 11; Doc. 54 at 8].  The Court assumes the Parties mean to

*See Hunt v. Montano*, 39 F.4th 1270, 1284 (10th Cir. 2022) ("When a § 1983 defendant raises qualified immunity, . . . the burden shifts to the plaintiff.").  Indeed, a motion to dismiss invoking qualified immunity creates a presumption of immunity.  *See Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022).

Likely recognizing that it has been clearly established, since at least 1988, that "retaliatory actions against a white employee because of [her] efforts to defend the rights of racial minorities may violate the employee's rights as enumerated in § 1981," the Parties focus on the degree to which the First Amended Complaint alleges individualized liability on the part of the Individual Defendants.[12]  *See Patrick v. Miller*, 953 F.2d 1240, 1250 (10th Cir. 1992).  Under 42 U.S.C. § 1981, a defendant's liability for violating a statutory right must be based on her or his individual retaliatory actions.  *See Perkins v. Fed. Fruit & Produce Co.*, 945 F. Supp. 2d 1225, 1254 (D. Colo. 2013).  The Individual Defendants argue that they are entitled to qualified immunity because the First Amended Complaint fails to allege facts that differentiate between Mr. Wailes, Mr.

---

reference her statutory rights under 42 U.S.C. § 1981, however, as Ms. Arnold makes no constitutional claim in the First Amended Complaint.

[12] The Parties do not focus their arguments on whether the alleged retaliation under § 1981 was "clearly established" as of May 2021.  *See* [Doc. 34 at 11–12; Doc. 43 at 10–13; Doc. 54 at 5–8].  Indeed, Defendants appear to concede that such a violation is clearly established by stating "[t]here is no question that an employer cannot retaliate against an employee for engaging in protected activity."  [Doc. 54 at 8].  Nevertheless, this Court is mindful of the Tenth Circuit's admonition that the clearly-established prong cannot be waived, temporarily or not, and the district court should conduct the clearly established inquiry in the first instance.  *See Hunt*, 39 F.4th at 1285.  The *Hunt* court contemplated that in the face of insufficient briefing on the clearly-established prong, the district court could either request further briefing by the parties or address the issue itself.  *Id.* ("The issue of whether the law is clearly established with respect to the conduct of Montano and Griffin, although a legal determination based on existing precedent, was only minimally briefed by the parties on appeal and was barely briefed below.  It was also unaddressed by the district court.").  Given Defendants' statement above, instead of requesting additional briefing from the Parties on this prong, this Court finds it most efficient to address the clearly-established prong.  *See* Fed. R. Civ. P. 1 (directing the court to construe the Federal Rules of Civil Procedure to secure the "just, speedy, and inexpensive determination of every action and proceeding").

Sassano, Ms. Hall, and Mr. Scott. *See* [Doc. 34 at 11–12; Doc. 43 at 10–13; Doc. 54 at 6–7]. The Court respectfully disagrees with Defendants' characterization of Ms. Arnold's allegations.

The First Amended Complaint groups the principal allegations involving the Individual Defendants, but that does not mean the allegations are problematically "undifferentiated." *See* [Doc. 34 at 12]. Ms. Arnold alleges that (1) Mr. Wailes, Mr. Sassano, Ms. Hall, and Mr. Scott were members of the Board "[a]t all relevant times"; (2) all Board members were aware of Ms. Arnold's recommendation to terminate Principal Littlefield; (3) Ms. Arnold sent her May 7, 2021, email "to the Board"; (4) "[e]ach member of the Board was angry and upset over Ms. Arnold's complaint"; and (5) "each member of the Board voted to terminate Ms. Arnold's employment." [Doc. 31 at ¶¶ 7–9, 11, 51, 62, 64–65]. That is sufficient to demonstrate how each Individual Defendant allegedly retaliated against Ms. Arnold, and the Court therefore agrees with Ms. Arnold that "[t]he concern with undifferentiated allegations is inapplicable" here. [Doc. 43 at 12]. Ms. Arnold has done more than "show that [her] rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (citation omitted). Rather, she has plausibly alleged that each Board member individually voted to terminate her employment because of her protected activity. It is therefore "clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original). Qualified immunity is **DENIED** at this stage.

## IV.     Title VI Retaliation (Count III)

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.

§ 2000d. Additionally, Title VI only "authorize[s] action . . . with respect to any employment practice" if "a primary objective of the Federal financial assistance is to provide employment." *Id.* § 2000d-3; *see also Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 n.8 (10th Cir. 1995) ("Although the literal language of § 2000d-3 establishing the requirement that a primary objective of federal funding be to provide employment only applies to federal administrative action to redress civil rights violations under Title VI, we apply the requirement to the implied private rights of action which have been read into the statute."). The Court assumes without deciding that Title VI gives rise to a cause of action for retaliation, as that issue is not presented here.

Once again, Defendants argue that Ms. Arnold did not plead that she engaged in protected activity. [Doc. 34 at 19]. Because Defendants do not set out this argument any differently than their other protected-activity arguments, or otherwise adapt it to Title VI, the Court respectfully rejects it for the reasons discussed above.

Defendants next contend that the First Amended Complaint does not state a claim under Title VI because it insufficiently alleges that the District received federal funds for the purpose of providing employment. [*Id.* at 18–20]. Ms. Arnold responds that she need not make that showing on a retaliation theory under Title VI and that, even if she must, either the First Amended Complaint suffices, or this presents an issue for the jury. [Doc. 43 at 21–24]. Assuming without deciding that Ms. Arnold must plead that the District received federal funds for employment purposes, the First Amended Complaint sufficiently does so.

The Tenth Circuit has explained that a Title VI claimant must show that the defendant "received federal funds for a primary objective of providing for employment." *Reynolds*, 69 F.3d at 1531. The *Reynolds* court found that a plaintiff failed to show that a federal grant "was intended primarily to provide employment and not simply to fund various school programs or enrichment

27

activities." *Id.* at 1532.   Here, Ms. Arnold alleges that the District received federal funding from, among other sources, ESSER funding under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136.   *See* [Doc. 31 at ¶¶ 96, 99].   The First Amended Complaint further alleges that ESSER funds were used "to provide employment by increasing teacher salaries, increasing salary and benefits for nurses working in the District, and creating new employment positions in the District."   [*Id.* at ¶ 99].   As Ms. Arnold points out in her Response, *see* [Doc. 43 at 24], the CARES Act provision concerning ESSER funding lists the acceptable uses of funds by recipients like the District, and one of those statutory purposes is "continuing to employ existing staff of the local educational agency."   CARES Act § 18003(d)(12).   Defendants may well be correct that "*[t]he* primary purpose" of the provision in question was "to support educational services and the ongoing functionality of K–12 schools given the effects of the COVID-19 pandemic," [Doc. 54 at 13 (emphasis added)], but the law asks only whether employment is "*a* primary objective." 42 U.S.C. § 2000d-3 (emphasis added).   The Court will not override statutory text that explicitly directs funds toward "continuing to employ existing staff."   CARES Act § 18003(d)(12).   Because Congress enumerated employment as a permissible use of ESSER funding, and because Ms. Arnold alleges that the District received ESSER funding, the Court finds this case distinguishable from *Reynolds* and concludes that the funding requirement imposed by Title VI is satisfied, to the extent it is applicable, by Ms. Arnold's allegations.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     Defendants' Motion to Dismiss First Amended Complaint and Jury Demand [Doc. 34] is **DENIED**.

DATED:  June 14, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge